CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 18 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| JARED TILSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 5:19-CV-033 |
| | ) | |
| v. | ) | |
| | ) | |
| ZOE HUMPHREY, et al., | ) | By: Michael F. Urbanski |
| | ) | Chief United States District Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on defendants' motions to dismiss. Defendants have filed two separate motions—the first filed by defendants Brian Bosserman, Chrystal Boyers, Regina Chestnut, James Doyle, Jeffery Estes, Douglas Grimm, William Lee Hereford, "Officer Carter," Donna Reynolds, Nicholas Shires, Shawn Smals, and the Middle River Regional Jail Authority (MRRJA), ECF No. 9, and the second by defendants Bradford Barker, David Bauguess, Jr., Zoe Humphrey, Barry Munsey, and Stacy Stewart, ECF No. 12. Both sets of defendants argue correspondingly that all claims alleging ordinary negligence against them should be dismissed on the grounds that defendants are entitled to sovereign immunity, and that all claims brought against defendants William Lee Hereford, Regina Chestnut, Donna Reynolds, and Barry Munsey should be dismissed as speculative. See ECF Nos. 10 & 13. Plaintiff Jared Tilson responded in opposition on June 11, 2019. ECF No. 21. Each set of defendants filed a brief in reply—one filed June 14, 2019 by Bosserman, Boyers, Chestnut, Doyle, Estes, Grimm, Hereford, Carter, Reynolds, Shires, Smals, and MRRJA, ECF No. 22,

and one filed on June 18, 2019 by Barker, Bauguess, Humphrey, Munsey, and Stewart, ECF No. 23.

On November 19, 2019, Tilson filed a consent motion for leave to file an amended complaint, dismiss defendants Bosserman, Carter, Estes, and Shires from this action, and dismiss Tilson's deliberate indifference claim against defendant Doyle. ECF No. 56. This motion was granted. Accordingly, Bosserman, Carter, Estes, and Shires were dismissed from this action, and Doyle was removed from Tilson's deliberate indifference claim.

For the reasons stated below, the court **GRANTS in part and DENIES in part** defendants' motion to dismiss.

## I.[1]

Tilson was sentenced to two months incarceration for larceny of a milkshake and ice cream bar at Sheetz gas station. ECF No. 61, at 1. Before he began his sentence, Tilson informed medical staff at MRRJA that he held a prescription for a high dosage of Xanax, had held this prescription for years, and would likely have a seizure if he stopped taking his prescribed dosage suddenly. Id. at 2. Tilson was told that MRRJA did not permit benzodiazepines and that Tilson would have to taper himself off his medication. Id. at 12. Tilson attempted to do so but was unable to completely taper himself off his medication before his sentence began. Id.

Tilson entered MRRJA at approximately 4:30 pm on April 27, 2018. ECF No. 61, at 11. He again informed jail staff that he had been prescribed Xanax and that an abrupt halt in

---

[1] All facts are taken from Tilson's Amended Complaint and are presumed to be true. Republican Party of North Carolina v. Martin, 980 F.2d v. 943, 952 (4th Cir. 1992).

his medication would cause seizures. Id. Tilson's Booking Observation Report reported that he was taking medications and had medical problems, including anxiety, epilepsy, and/or seizures. Id. Tilson did not see a medical staff member to have his "Health History and Assessment" form filled out until April 30, 2018.

Tilson first complained of symptoms of benzodiazepine withdrawal on April 28, 2018 to defendant Licensed Practical Nurse ("LPN") Stacy Stewart ("LPN Stewart"). ECF No. 61, at 12–13. Tilson complained of a migraine and explained he believed it was caused by the sudden halt in his Xanax dosage. Id. Tilson also mentioned his history of seizures. Id. LPN Stewart gave Tilson Ibuprofen and wrote on his medical chart: "IM c/o migraine has been tapering self off Xanax due to being incarcerated has Hx of seizures gave IM 800 mg Ibuprophen (sic) for headache S Stewart LPN 0235." Id. at 12. No further action was taken by LPN Stewart. Id. Tilson did not see medical staff again until April 30, 2018. Id.

On April 30, Tilson met with medical staff and was asked a series of questions by defendant LPN Zoe Humphrey ("LPN Humphrey") regarding his medical history. ECF No. 61, at 12. Tilson told LPN Humphrey that he was prescribed Xanax, that he took between four and six milligrams per day, and that his doctor told him he would have seizures if he stopped taking Xanax. Id. He also told LPN Humphrey that he had been trying to taper himself off his dosage before his incarceration began in response to what an MRRJA medical staff member told him on the phone but had not completely stopped taking his prescribed Xanax before entering MRRJA. Id. Tilson also told LPN Humphrey that he had already had one migraine since entering MRRJA and "was worried about what would happen to him next." Id. at 12 –13.

At the time of Tilson's incarceration, MRRJA had a Benzodiazepine Taper Protocol and Medical Guidelines for Acute Benzodiazepine Withdrawal. ECF No. 61, at 13. Tilson alleges that, for LPNs Humphrey and Stewart, these protocols and guidelines established medical procedures that were mandatory and "required no appreciable medical discretion." Id. The procedures are alleged as follows:

1. Performing a withdrawal assessment using a CIWA-AR form
2. Taking vital signs
3. Obtaining a urine screen to check for benzodiazepine use
4. Contacting outside primary care doctor, including records request
5. Requesting an appointment with the jail doctor or medical director
6. Requesting an appointment with the jail physician assistant
7. Requesting specialized housing to ensure patient safety
8. Review of policy to ensure quality of care

Id. According to the medical records, LPNs Humphrey and Stewart did not do any of the above tasks listed in the preceding paragraph, with the exception of the one meeting at which LPN Humphrey took Tilson's vital signs when filling out his "Health History and Assessment" form. Id. Tilson makes a number of allegations and alternative allegations regarding LPNs Humphrey and Stewart's conduct, including that they did not follow the above policies and did not report Tilson's self-reported Xanax use and cessation or his migraine, or alternatively, did report the Xanax use, Xanax cessation, and migraine, but proper action was not taken by those to whom LPNs Humphrey and Stewart reported. Id. at 14.

Tilson also alleges that defendants Registered Nurse ("RN") Regina Chestnut ("RN Chestnut"), RN Donna Reynolds ("RN Reynolds"), Physician Assistant ("PA") Barry Munsey ("PA Munsey"), and Dr. William Hereford ("Dr. Hereford") were subject to procedures

4

establishing mandatory tasks that required no appreciable medical discretion, triggered by

Tilson's self-reported regular use of Xanax (prescribed or otherwise):

> 1. Reviewing, or referring the inmate to psychiatry to review, the medical records of inmates who are reported by LPNs/RNs to be on Xanax and not currently receiving Xanax.
> 2. Reviewing the medical records of inmates who are reported by LPNs/RNs to be complaining of migraine due to self-tapering off Xanax and not receiving Xanax while in jail.
> 3. Starting, or referring the inmate to psychiatry to start, the Benzodiazepine/Xanax tapering protocol which includes taking vital signs.
> 4. Seeing the inmate or referring the patient to Mental Health practitioners to see the inmate, within 72 hours of admission to jail.
> 5. Reviewing or performing a withdrawal assessment.

ECF No. 61, at 15–16. Tilson alleges that, according to medical records, RN Chestnut, RN

Reynolds, PA Munsey, and Dr. Hereford did none of the things listed in the preceding

paragraph, and that this failure was a violation of the standard of care. Id. at 16.

On May 2, 2018, defendant Officer Gary Taylor ("Taylor") wrote in an incident report

that Tilson approached him and told him he needed to be moved off the prison pod. ECF

No. 61, at 16. Taylor also reported that Tilson was making "strange remarks that didn't make

any sense." Id. In response, Taylor moved Tilson to segregation and recorded that he needed

to see a mental health professional. Id. at 18. Taylor signed his report, as did defendants Shift

Supervisor Cp. David Bauguess, Jr. ("Bauguess") and Watch Commander Sergeant Bradford

Barker ("Barker"). Standards of procedure required that an inmate entering segregation receive

an evaluation of his physical condition from the medical staff. Id. at 16–17. This evaluation

was not performed. Id. at 17. Tilson alleges that defendants Bauguess, Barker, James Doyle

("Doyle") Chrystal Boyers ("Boyers"), and Douglas Grimm ("Grimm") all served a shift as

Shift Supervisor between the time Tilson was moved to segregation and the time he had his seizure, and all failed to ensure Tilson received a medical screening. Id. at 17–18. As the mental health professional who visits MRRJA was not scheduled to be at the jail until May 4, all of the above listed individuals knew that Tilson would not see a medical professional for another two days unless one of them contacted medical staff. Id. at 19. None of them did so. Id.

On May 3, at approximately 5:00 am, Tilson was found on the floor of his cell by Officer Shawn Smals ("Smals"). ECF No. 61, at 21. Tilson was seizing and unresponsive. Id. Smals called for medical assistance; RN Sonya Randall Edwards ("RN Randall") and Officer Carter came to Tilson's cell. Id. at 22. RN Randall concluded Tilson would need to go to the hospital. Id. Tilson alleges that RN Randall failed to follow certain simple, mandatory medical tasks required in the medical field when he had his seizure:

> 1. Documenting medical encounters with patient;
> 2. Maintaining patient's airway during a seizure; and
> 3. Taking vital signs.

Id. Tilson alleges that her failure to do so was a violation of the standard of care. Id. Additionally, MRRJA had nursing guidelines in the case of a seizure emergency that listed the following "mandatory tasks":

> Immediate Emergency Care and ambulance transfer to hospital without delay:
> 1. Repetitive/persistent seizures.
> 2. Severe respiratory distress.
> 3. Notify Emergency Medical Services and arrange ambulance transfer to Emergency Room.
> Nursing Intervention – Routine:
> If patient actively having seizure activity, protect from injury and prevent aspiration
> . . .

> Seizure activity generally lasts 2-3 minutes . . . If the seizure lasts longer than (sic) an emergency situation exists and life support transportation is necessary.

Id. at 22–23. Tilson alleges these were not followed. Id.

Tilson was taken to Augusta Health Center, but when his condition worsened, he was taken by helivac to Roanoke Memorial Hospital. ECF No. 61, at 23. According to Roanoke Memorial physicians, Tilson suffered a seizure of at least 45 minutes. Id. at 25. As a result, he experienced a variety of serious medical conditions, requiring a variety of invasive medical procedures, all of which caused him pain and trauma. Id. Tilson also alleges that defendant RN Chestnut went out of her way to prevent Tilson's medical providers from disclosing his condition to Tilson's family while hospitalized, without legitimate reason justifying this. Id. at 24.

Tilson was put into a medically induced coma at Roanoke Memorial. ECF No. 61, at 23. When he awoke, he had multiple chipped teeth and could not walk on his own for three days. Id. at 24–25. He was not permitted to drive for six months, not permitted to swim without another person present, and is currently subject to other health-based restrictions. Id. Tilson also experienced significant memory loss that required he relearn how to do his job and relearn the location of places he has visited many times before. Id.

Tilson brings a number of allegations, based on violations of the above medical and MRRJA standards. See ECF No. 61. He alleges that MRRJA policy requires that jail staff "personally observe inmates at least twice an hour" and that "[i]nmates who are violent or mentally ill or who demonstrate unusual or bizarre behavior will receive more frequent observation." ECF No. 61, at 25. Tilson brings seven counts: (1) medical malpractice (ordinary

negligence) against LPNs Humphrey, Stewart, and Edwards, Dr. Hereford, PA Munsey, and RNs Chestnut and Reynolds; (2) medical malpractice (gross negligence) brought against the same; (3) medical malpractice (willful and wanton negligence) brought against the same; (4) deliberate indifference pursuant to 42 USC § 1983 (deprivation of the Eighth Amendment right to be free from cruel and unusual punishment by receiving access to adequate medical care) brought against the same; (5) ordinary negligence brought against Officers Bauguess, Barker, Boyers, Carter, Doyle, Grimm, Shires, Smals, and Taylor; (6) respondeat superior liability brought against MRRJA; and (7) deliberate indifference pursuant to 42 USC § 1983 (deprivation of the Eighth Amendment right to be free from cruel and unusual punishment by receiving access to adequate medical care) brought against the same (with the exception of Doyle). Id. at 29–45.

## II.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a court's subject matter jurisdiction. Absent subject matter jurisdiction, a court must dismiss the action. Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp., 166 F.3d 642, 653 (4th Cir. 1999). Whether a plaintiff has standing to bring a cause of action "is generally associated with Civil Procedure Rule 12(b)(1) pertaining to subject matter jurisdiction." CGM, LLC v. BellSouth Telecomms., Inc., 664 F.3d 46, 52 (4th Cir. 2011). "That is because 'Article III gives federal courts jurisdiction only over cases and controversies,' and standing is 'an integral component of the case or controversy requirement.'" Id. (quoting Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006)). When a defendant raises substantive challenges to a court's jurisdiction under Rule 12(b)(1), the court need not accept the complaint's allegations as true

and may consider facts outside the complaint to determine if it can properly exercise subject matter jurisdiction. Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). At all times, "[t]he plaintiff has the burden of proving that subject matter jurisdiction exists." Evans, 166 F.3d at 647.

Meanwhile, Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). A plaintiff establishes "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In ruling on a 12(b)(6) motion, the court must accept all well-pleaded allegations in the complaint as true and draw all reasonable factual inferences in the light most favorable to the plaintiff. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; see Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 365 (4th Cir. 2012) (holding the court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments") (internal quotation marks omitted).

### III.

Defendants move to dismiss all claims alleging ordinary negligence on the ground that they are shielded from such claims by the doctrine of sovereign immunity. ECF No. 10; at 1;

9

ECF No. 13, at 1. Additionally, defendants argue that all of Tilson's claims against Dr. Hereford, RNs Chestnut and Reynolds, and PA Munsey are "based on pure speculation, which is insufficient to meet the pleading standard," and should thus be dismissed. ECF No. 10, at 2. The court will address each argument in turn.

## A.

Whether a regional jail authority is entitled to sovereign immunity turns on whether it operates as a municipal corporation. See Virginia Elec. And Power Co. ("VEPCO") v. Hampton Redevelopment and Housing Authority, 217 Va. 30, 34, 225 S.E.2d 364, 368 (1976) (finding that a municipal corporation is entitled to sovereign immunity for the exercise of governmental functions). In Hampton Roads Sanitation Dist. Comm'n v. Smith, 193 Va. 371, 376, 68 S.E.2d 497, 500 (1952), the Supreme Court of Virginia created a two-factor test to resolve whether an entity should be deemed a municipal corporation: (1) "how many attributes of a municipal corporation does the entity in dispute possess?" and (2) "in the light of this initial consideration, what is the particular purpose for which it is sought to determine whether or not a municipal corporation is present?" On the first factor, the Hampton Roads court outlined six defining attributes of a municipal corporation:

(1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth;

(2) Creation to serve a public purpose;

(3) Power to have a common seal, to sue and be sued, to enter into contracts to acquire, hold, and dispose of its revenue, personal, and real property;

(4) Possession of the power of eminent domain;

(5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state; and

(6) Management of the corporation vested in a board of directors or a commission.

City of Richmond v. Richmond Metropolitan Authority, 210 Va. 645, 647, 172 S.E.2d 831, 832 (1970).

Regional jail authorities are created by statute. Va. Code § 53.1-95.2. MRRJA was created by Augusta County, Rockingham County, City of Staunton, City of Waynesboro, and City of Harrisonburg. Haleem v. Quinones, No. 5:17-cv-00003, 2017 WL 4400767, at *3. These entities all have sovereign immunity either as counties (political subdivisions of the Commonwealth) or municipalities in the exercise of their governmental functions. Id. Defendants argue that MRRJA possesses four of the six Hampton Roads attributes of a municipal corporation, lacking only eminent domain and a designation as a political subdivision of the Commonwealth. Defendants cite to the recent decision Haleem v. Quinones, 2017 WL 4400767, decided by the honorable Judge Elizabeth Dillon, who, in answering the second question of the Hampton Roads test, held that "in light of the entire statutory scheme creating jail authorities, a regional jail authority has the status of a municipal corporation for sovereign immunity purposes, even with these two missing attributes." As to the two missing attributes, Judge Dillon reasoned:

> First of all, it is true that the words "body corporate and politic" do not appear in the enabling statute for regional jail authorities. Instead, the governing statutory scheme provides that "the governing bodies of two or more counties, cities, or towns or a combination thereof may be concurrent ordinances or resolutions or by agreement, create a jail authority." Va. Code §

11

53.1-95.2. The General Assembly states that each regional authority "shall be deemed <u>to be an instrumentality exercising public and essential governmental functions</u> to provide for the public safety and welfare." Va. Code § 53.1-95.7 (emphasis added).

<u>Haleem</u>, 2017 WL 440076, at *13–14. Judge Dillon further pointed out that Va. Code § 53.1-95.22 provides that the article creating jail authorities "shall be liberally construed to effect the purposes thereof." Defendants request the court follow this precedent.

Defendants additionally argue that the statutory language granting powers to regional jail authorities shows that the General Assembly considers them as bodies corporate and politic, even if they are not expressly designated as such. ECF No. 13, at 8. Even when governmental bodies are not expressly deemed municipal corporations, "where it appears that the legislature intended that they should be so construed, the designation 'municipal corporation' is often used in a broad or generic sense to include those 'quasi-municipal corporations' which are created to perform an essentially public service." <u>York Cty v. Peninsula Airport Com.</u>, 235 Va. 477, 480, 369 S.E.2d 665, 666 (1988). Defendants argue that the lack of explicit language and power of eminent domain is inconsequential, for two reasons. ECF No. 10, at 8. First, each of MRRJA's member localities would certainly be granted sovereign immunity if they operated a jail independently. <u>See</u> <u>Franklin v. Richlands</u>, 161 Va. 156, 158, 170 S.E. 718, 719 (1933) (holding that a municipality is entitled to sovereign immunity for the operation of a jail). Indeed, local governments are required to construct and operate jails. Va. Code § 53.1-71. Defendants argue that "there is no sound reason why a jail authority—created to curb costs ordinarily borne in full by individual localities—should not be afforded the same immunity afforded to local governments performing the exact same

function." ECF No. 13, at 9. See Dowdy v. Pamunkey Reg'l Jail Auth., No. 3:14-cv-003-JAG, 2014 WL 2002227, at *3 (E.D. Va. May 15, 2014) ("While Virginia law does not designate a jail authority as a political subdivision, for all intents an authority runs a jail the same way a city, county, or town would."). And finally, while MRRJA does not have eminent domain itself, each member locality does. Theoretically, these localities could exercise this power on MRRJA's behalf. Defendants argue this negates any inference that could be drawn from individual MRRJA's want of eminent domain.

In response, Tilson points out that this court has dealt with, and rejected, this argument before, in Boren v. Northwestern Regional Jail Authority, No. 5:13-cv-013, 2013 WL 5429421 (W.D. Va. 2013). ECF No. 21, at 1. Tilson argues for the same result here, as there is no evidence that Virginia's General Assembly intended jail authorities be treated as a city for any purposes. See In re Rowe, 750 F.3d 392, 396 (4th Cir. 2014) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Tilson also argues there is no evidence that the Supreme Court of Virginia intended to clothe jail authorities with sovereign immunity. ECF No. 21, at 1–2. See e.g., Hampton Roads Sanitation Dist. Comm'n, 193 Va., 225 S.E.2d; City of Richmond v. Richmond Metro. Auth., 210 Va. 645, 172 S.E.2d 831 (1970); Virginia Elec. & Power Co. v. Hampton Redevelopment & Hous. Auth., 217 Va. 30, 225 S.E.2d 364 (1976); York Cty, 235 Va., 369 S.E.2d. Finally, Tilson argues that caselaw indicates the most significant of the elements that identify a municipal corporation is whether the legislature expressly designated an entity as a political subdivision, and MRRJA's lack of such a designation is fatal to its claim of sovereign immunity. York Cty., 235 Va. at 481, 369 S.E.2d at 667.

The court must acknowledge the conflict this question has created in Virginia federal courts. Courts have ruled both in favor and in denial of granting sovereign immunity to regional jail authorities. Compare Heckenlaible v. Virginia Reg'l Peninsula Jail Auth., No. 4:06cv25, 2006 WL 3196750 (E.D. Va. Nov. 1, 2006) with Dowdy Pamunkey Reg'l Jail Auth., No. 3:14-cv-003-JAG, 2014 WL 2002227 (E.D. Va. May 15, 2014). In Boren, this court, looking to Heckenlaible, held that an entity "could not be treated as a municipal corporation if it did not possess all six of [the] essential attributes of a municipal corporation." 2013 WL 54294421, at *4. At the time, this was the state of the law; since this decision, the court finds that the law has evolved such that an entity need not possess all six essential attributes to be treated as a municipal corporation. As Dowdy Pamunkey Reg'l Jail Auth. held, regional jail authorities possess "many characteristics typical of local governments," including "a quintessentially public purpose," a governing body, the ability to "acquire property, appoint officers and employees, make contracts, undertake various projects, accept governmental grants and loans, and sue and be sued," an immunity from taxation, and state reimbursement for construction and operational costs. 2014 WL 2002227, at *3. These characteristics entitle it to treatment as a municipal corporation for purposes of sovereign immunity. As Dowdy further noted, "[t]he Virginia Supreme Court has clearly held that the operation of a jail is a governmental function, for which a municipal corporation is immune from suit." Id.

The above authority, including Judge Dillon's decision in Haleem, leads the court to hold that MRRJA is entitled to sovereign immunity. The court thus **GRANTS** defendants' motion as it pertains to MRRJA. All claims brought in this case as they pertain to MRRJA are **DISMISSED**.

## B.

The determination that MRRJA is immune from suit does not automatically dictate that MRRJA employees are similarly immune. Sovereign immunity can, but does not always, protect employees of local governments. Messina v. Burden, 228 Va. 301, 312, 321 S.E.2d 657, 663 (1984). While Virginia, its political subdivisions, and high-level governmental officials have absolute immunity unless waived, "other government employees and officials have qualified immunity depending on the function they perform and the manner of performance." Cunningham v. Rossman, 80 Va. Cir. 543, *4 (2010). Messina provides a four-part test to determine whether the employee is immune—the court must consider: (1) the nature of the function performed by the employee; (2) the extent of the state's interest and involvement in that function; (3) the degree of control exercised by the state over the employee; and (4) whether the alleged negligent act involved judgment and discretion." 228 Va. at 312, 321 S.E.2d at 663.

It is well established that the operation of a regional jail is a per se governmental function and that Virginia has a significant interest in the provisions of adequate medical care and proper supervision of inmates. See Va. Code §§ 53.1-85.7, 53.1-32; 53.1-26; 53.1-133.01. And numerous cases have found that sufficient state involvement and control in the actions of state-employed public health employees to support the extension of sovereign immunity. See Coppage v. Mann, 906 F. Supp. 1025, 1048 (E.D. Va. 1995); Lohr v. Larsen, 246 Va. 81, 86, 431 S.E.2d 642, 645 (1993). Whether the individual defendants at issue here will be shielded from Tilson's claims of ordinary negligence will therefore turn on whether their acts alleged by the Amended Complaint "involved judgment and discretion."

As a preliminary matter, Tilson asserts that all defendants were subject to certain MRRJA standards and policies that removed all discretion from their actions in reaction to Tilson's medical needs. The plaintiff in Dowdy made a similar claim, citing prison rules violated by the officer defendants, but as the Dowdy court made clear, "the existence of regulations and guidelines does not answer the question of whether, and to what extent, the employee in question must exercise discretion and judgment in applying those rules and procedures in often uncertain and confused situations." 2014 WL 2002227, at *4.

The court takes guidance from Muse v. Schleidan, 349 F. Supp. 2d 990, 992 (E.D. Va. 2004), in which a plaintiff brought suit against a police officer for damages resulting from an accident when the officer, while responding to a domestic violence report, failed to turn on his emergency lights and entered an intersection against a red light. In attempting to avoid summary judgment, the plaintiff argued that police department policy removed any discretion the officer had in responding to the situation; the trial court disagreed. Id. at 1000. Among many observations made in response to the plaintiff's argument, the court noted:

> . . . even assuming the interpretation of [police policy] were a disputed issue of fact, the dispute is not material. While the [department] policy is instructive, it is not determinative. Sovereign immunity does not ultimately depend on whether a departmental policy gives an emergency vehicle driver discretion to activate his emergency lights and sirens. Put differently, if a policy granted deputies unfettered discretion to engage in emergency response driving, such a policy would not extend sovereign immunity's protection to any and every driving situation. Nor would a policy that denied officers any discretion to activate their emergency response equipment nullify the sovereign immunity bar in situations that reasonably require officers to exercise their judgment to balance the special risks associated with responding to an emergency. Rather, the policy is merely instructive and gives guidance to the immunity determination to the extent that it reflects that, in the judgment

> of expert persons, certain circumstances constitute an emergency
> that would warrant an officer to engage in emergency response
> driving.

Accordingly, the court will examine the applicable MRRJA standards and procedures and

determine what level of judgment a defendant was required to exercise under these standards,

but will not consider them definitive. That a list of policies in place at MRRJA on its face

required certain actions will not on its own determine whether a defendant's alleged actions

were ministerial or discretionary.

The individual defendants can be divided into two categories: "medical defendants"

who were employed by MRRJA as doctors, nurses, or physicians' assistants (LPNs Humphrey,

Stewart, and Edwards, RNs Chestnut and Reynolds, Dr. Hereford, and PA Munsey) and

"security defendants" who were employed by MRRJA as officers and prison guards (Officers

Bauguess, Barker, Boyers, Carter, Doyle, Grimm, Shires, Smals, and Taylor). Their respective

acts and omissions are of a different nature. The court will address the medical defendants

first.

Paragraph 116 of Count I of the Amended Complaint alleges that LPN Humphrey

performed Tilson's "Health History and Assessment," during which Tilson told her that he

had been taking Xanax before entering MRRJA and had not been able to fully taper off his

medication. ECF No. 61, at 29. The Amended Complaint also alleges that LPN Humphrey

failed to follow several of the required elements of MRRJA's Benzodiazepine Taper Protocol

and Medical Guidelines for Acute Benzodiazepine Withdrawal. Id. LPN Humphrey allegedly

did perform one of the items listed on this protocol—she took Tilson's vital signs. The

Amended Complaint alleges, however, that none of the remaining items on the protocol were

performed, and none of these items as listed required a determination of whether the item was necessary once Tilson reported his Xanax use. Given that most of the listed items, as alleged, required no appreciable judgment or discretion to perform, LPN Humphrey is not at this point entitled to sovereign immunity as regards the allegations of paragraph 116 of Count I of the Amended Complaint. Similarly, paragraph 116 alleges that LPN Stewart did not perform the actions required by MRRJA's Benzodiazepine Taper Protocol and Medical Guidelines for Acute Benzodiazepine Withdrawal upon being told of Tilson's Xanax use. Id. At this point, the decision of whether to dismiss Count I as regards LPNs Humphrey and Stewart turns on the allegations of the Amended Complaint. Based on these allegations, the court cannot dismiss paragraph 116 of Count I at this time, but expects to revisit the issue following discovery under Rule 56.

Paragraphs 117 and 118 of Count I of the Amended Complaint brings claims against RNs Chestnut and Reynolds in the alternative, alleging that, if Tilson's Xanax use was reported to either of them, they were obliged to follow the Benzodiazepine Taper Protocol and Medical Guidelines for Acute Benzodiazepine Withdrawal. ECF No. 61, at 29. These same alternative claims are brought against PA Munsey and Dr. Hereford. Id. Given the nature of the alleged claims regarding the Benzodiazepine Taper Protocol and Medical Guidelines for Acute Benzodiazepine Withdrawal, paragraphs 117 and 118 of Count I cannot be dismissed on sovereign immunity grounds at the motion to dismiss stage. Defendants' argument that these claims are speculative is addressed below.

The allegations against LPN Edwards in paragraph 119 of Count I, however, are of a different nature. The Amended Complaint alleges that LPN

Edwards failed to document Tilson's seizure in his medical chart, failed to take vital signs, and failed to maintain his airway on the way to the hospital. Tilson alleges these omissions were in contravention of MRRJA's nursing guidelines "Seizure Emergency: Nursing Intervention." ECF No. 61, at 30. LPN Edwards's actions in these moments, however, occurred during an emergency situation. Jurisprudence regarding the extension of sovereign immunity to individual government employees draws a distinction between actions taken or omitted in emergency versus ordinary circumstances. Compare Nat'l R.R. Passenger Corp. v. Catlett Volunteer Fire Co., 241 Va. 402, 404 S.E.2d 216 (1991) (holding that sovereign immunity shields a fireman who violates traffic laws while responding to an emergency) with Friday-Spivey v. Collier, 268 Va. 384, 601 S.E.2d 591 (2004) (holding that a fireman is not entitled to sovereign immunity when responding to a non-emergency, public service call). LPN Edwards's decisions in how to secure aid and care for Tilson during his seizure required she prioritize certain tasks during an ongoing emergency situation, which called for the use of judgment and discretion and thus are shielded by sovereign immunity. Sovereign immunity thus extends to LPN Edwards, and the ordinary negligence claims against her in paragraph 119 of Count I of the Amended complaint are **DISMISSED**.

The allegations of ordinary negligence against the security defendants are contained in Count V and largely deal with the alleged failure to secure a medical screen for Tilson on May 2, 2019 and the alleged failure to more frequently observe Tilson while he was in segregation, delaying Tilson's receipt of medical care. ECF No. 61, at 39–40. The Amended Complaint alleges MRRJA "had a policy in place to ensure that inmates who are transferred to segregation receive a timely medical screen," and that Bauguess, Barker, Grimm, Doyle, and Boyers failed

to take this step. This policy, SOP 3.34, does not state when exactly the medicals screen must occur. It only requires that it occur in a "timely manner." Tilson was moved to segregation at 4:30 p.m. on May 2, 2019. He was found seizing at 5:05 a.m. on May 3. At the time of his seizure, there had been an overnight delay of Tilson's medical screen, from the late afternoon hour of Tilson's transfer to segregation to the discovery of his seizure. The determination of how pressing the need for a medical screen was when no specific timeframe was identified by MRRJA policy required the exercise of "judgment and discretion" by Bauguess, Barker, Grimm, Doyle, and Boyers. Thus, the failure to secure a medical screen before Tilson's seizure began cannot support Count V. The ordinary negligence allegations contained in paragraphs 143 and 144 of Count V of the Amended Complaint are **DISMISSED**.

Next, in paragraphs 145 and 146 of Count V of the Amended Complaint, Tilson alleges that Taylor observed Tilson making "strange remarks that didn't make any sense." Taylor placed Tilson to see the visiting doctor from Valley Mental Health, who would not arrive for another two days. SOP 3.34 required that, should an inmate either complain of or exhibit an "apparent medical/dental pr [sic] psychological problem," the "observing staff member shall immediately notify the medical staff." Tilson alleges that Taylor's actions constitute a failure to "immediately notify medical staff." ECF No. 61, at 40. Barring extreme behavior not specifically alleged here, the determination of what behavior constitutes a psychological problem certainly requires judgment and discretion. Determining how and to whom he ought to report upon observing Tilson's behavior required Taylor decide the urgency of this situation. Taylor's choice to refer Tilson to the visiting mental health professional, while requiring a delay in treatment, did constitute a notification to medical staff and was an action

within the judgment and discretion accorded by SOP 3.34, and by the law. Accordingly, the ordinary negligence allegations in paragraphs 145 and 146 of Count V of the Amended Complaint are **DISMISSED**.

Paragraphs 147 and 148 of Count V of the Amended Complaint also allege that, as the jail staff assigned to monitor Tilson during the time he had his seizure, Smals, Bauguess, and Boyers breached their duty to Tilson by failing to observe him as frequently as was required while he was in segregation. ECF No. 61, at 41. The Amended Complaint alleges that MRRJA policy provided that jail staff personally observe inmates at least twice an hour, and more frequently for those who exhibiting unusual behavior. The Amended Complaint asserts that Tilson had been seizing for 45 minutes when he was found and transported to Augusta Health Center. That Tilson could not have been observed as frequently as he ought to have been seems a reasonable inference from these facts. Thus, for the alleged failure to properly observe Tilson as allegedly required by MRRJA policy, Smals, Bauguess, and Boyers cannot be dismissed from Count V at this point. As with the above rulings regarding the medical defendants, the court's determination regarding paragraphs 147 and 148 and the Count V claims against Smals, Bauguess, and Boyers may be revisited following discovery and Rule 56 motions.

## IV.

Finally, defendants also claim that Tilson's claims against Dr. Hereford, RNs Chestnut and Reynolds, and PA Munsey are entirely speculative and thus must be dismissed. ECF No. 10, at 17; ECF No. 13, at 13. In his Complaint, Tilson alleges that LPNs Humphrey and Stewart were negligent because they failed to report Tilson's Xanax use, abrupt cessation, and

migraine to PA Munsey or another jail RN or MD—namely, Dr. Hereford, RN Chestnut, RN

Reynolds, or PA Munsey. See ECF No. 61, at 14–16. Tilson then makes the following

alternative allegations:

> 48. In the alternative, Humphrey did report Mr. Tilson's self-reported Xanax use and abrupt cessation to RN Chestnut, RN Reynolds, PA Munsey, and/or Dr. Hereford.
> 49. In the alternative, Humphrey did report Mr. Tilson's self-reported migraine as a symptom of his abrupt Xanax cessation to RN Chestnut, RN Reynolds, PA Munsey, and/or Dr. Hereford.
> 50. In the alternative, Stewart did report Mr. Tilson's self-reported Xanax use and abrupt cessation to RN Chestnut, RN Reynolds, PA Munsey, and/or Dr. Hereford.
> 51. In the alternative, Stewart did report Mr. Tilson's self-reported migraine as a symptom of his abrupt Xanax cessation to RN Chestnut, RN Reynolds, PA Munsey, and/or Dr. Hereford.

Id. at 14. Tilson alleges "to the extent RN Chestnut, RN Reynolds, PA Munsey, and Dr.

Hereford were provided information about Mr. Tilson's self-reported Xanax use by

Humphrey and/or Stewart," they failed to provide appropriate treatment under the protocol.

Id. at 16–17. Defendants argue that this language is insufficient; Tilson does not allege facts

to show LPNs Humphrey or Stewart ever reported Tilson's alleged symptoms to Dr.

Hereford, RNs Chestnut and RN Reynolds, or PA Munsey. ECF No. 10, at 17; ECF No. 13,

at 13. They contend that Tilson's Complaint amounts to pure speculation with respect to these

defendants and does not meet the pleading requirements of Federal Rule of Civil Procedure

12(b)(6). Id.

Certainly, plaintiffs must allege facts in their complaints to "raise a right to relief above

the speculative level," Twombly, 550 U.S. at 555, but Federal Rule of Civil Procedure 8(d)

permits a plaintiff to "set out conflicting alternative theories in its complaint without one

constituting an admission against the other." Zee Co. v. Williams, Mullen, Clarke & Dobbins,

P.C., 547 F. App'x 166, 168 n.3 (citing Fed R. Civ. P. 8(d)(2)). Parties may plead alternative theories of liability—indeed, "as many theories as the facts will fit." United States for use & benefit of Tusco, Inc. v. Clark Constr. Grp., LLC, 235 F. Supp. 3d 745, 755 (D. Md. 2016). See Jaroseiwicz v. County of Rutherford, No. 1:05cv211, 2005 WL 2000238, at *1 (W.D.N.C. Aug. 18, 2005) ( . . . a motion to dismiss is not the time to test the sufficiency of the evidence and that pleading in the alternative is anticipated by Rule 8 . . . "). Tilson may plead alternate theories of liability—those claims that are not borne out by evidence will be eliminated later in litigation.

**V.**

For the reasons explained above, the court **GRANTS in part and DENIES in part** defendants' motion to dismiss. ECF Nos. 9 & 12. MRRJA is **DISMISSED** from all counts of this action. The allegations of paragraph 119 of Count I and defendant Edwards are **DISMISSED** from Count I. The allegations of paragraphs 143, 144, 145 and 146 are **DISMISSED** from Count V. Consequently, defendants Barker, Grimm, Doyle, and Taylor are dismissed from Count V.

An appropriate Order will be issued.

Entered: 12/18/19

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge