CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 2 4 2021

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

JARED TILSON,               )
    Plaintiff,              )
                    )    Civil Action No.:  5:19-cv-00033
v.                         )
                    )    By:    Michael F. Urbanski
ZOE HUMPHREY, et al.,       )    Chief United States District Judge
    Defendants.             )

### MEMORANDUM OPINION

This matter comes before the court on two motions for summary judgment filed by the defendants. Defendant Shawn Smals has filed a motion for summary judgment, ECF No. 114, and defendants Stacy Stewart and Zoe Humphrey[1] have filed their own motion for summary judgment, ECF No. 116. Plaintiff Jared Tilson has responded in opposition to each of these motions. ECF Nos. 132, 133. Smals filed a reply brief in support of his motion for summary judgment, ECF No. 139, and Stewart and Humphrey filed reply briefs in support of each of their motions, ECF Nos. 140 and 141. For the reasons explained herein, the court will **DENY** defendants Stewart and Humphrey's motion for summary judgment, ECF No. 116, and **GRANT** defendant Smals' motion for summary judgment, ECF No. 114.

---

[1] In bringing these motions, Stewart and Humphrey were originally joined by defendants Gary Taylor, Debra Taylor, and Sonya Randall Edwards, but those defendants have since been dismissed upon stipulation by the parties. ECF No. 137. The court also has dismissed the following defendants upon stipulations by the parties: William Lee Hereford, Regina Chestnut, Donna Reynolds, and Barry Munsey, ECF No. 78; as well as Bradford Barker, Chrystal Boyers, David Bauguess, Jr., James Doyle, and Douglas Grimm, ECF No. 83. The court also previously dismissed all claims against Middle River Regional Jail Authority ("MJJRA"). See Order, ECF No. 66, at 2. Others were dismissed upon Tilson's filing of the amended complaint. See id.

1

## I.     BACKGROUND

Tilson was sentenced to two months' incarceration for larceny of a milkshake and ice cream bar at Sheetz gas station. Am. Compl., ECF No. 61, ¶ 1. Before he began his sentence, Tilson informed medical staff at Middle River Regional Jail ("MRRJ") that he held a prescription for a high dosage of Xanax, a benzodiazepine; that he had held this prescription for years; and that he would likely have a seizure if he stopped taking his prescribed dosage suddenly. Id. Tilson was told that MRRJ did not permit benzodiazepines and that Tilson would have to taper himself off his medication. Id., ¶¶ 33–34. Tilson attempted to do so but was unable to completely taper off his medication before his sentence began. Id., ¶ 34. At the time Tilson started tapering, he was taking six 1 mg tablets of Xanax per day and was still taking three Xanax tablets of 1 mg each per day when he turned himself in to start serving his sentence. Tilson Dep., ECF No. 117-1, at 48:4-9.

Tilson entered MRRJ at approximately 4:30 p.m. on April 27, 2018. Am. Compl., ECF No. 61, ¶ 35. He again informed jail staff that he had been prescribed Xanax and that an abrupt halt in his medication would cause seizures. Id., ¶ 36. Tilson's Booking Observation Report said that he was taking medications and had a number of medical conditions, including anxiety and either epilepsy or seizures. Id., ¶ 37. Tilson did not see a medical staff member to have his "Health History and Assessment" form filled out until April 30, 2018. Id., ¶ 38.

Tilson first complained of symptoms of benzodiazepine withdrawal on April 28, 2018, to defendant Stacy Stewart, a licensed practical nurse ("LPN"). Id., ¶¶ 39–41; Tilson Dep., ECF No. 117-1, at 51:9–52:4; Stewart Decl., ECF No. 117-3, ¶ 2. Tilson complained

of a migraine and told her that he had been self-tapering off a Xanax prescription. Tilson Dep., ECF No. 117-1, at 51:9–52:4; Stewart Decl., ECF No. 117-3, ¶ 2. Tilson also mentioned his history of seizures. Id. Stewart gave Tilson Ibuprofen and wrote on his medical chart: "IM c/o migraine has been tapering self off Xanax due to being incarcerated has Hx of seizures gave IM 800 mg Ibuprophen [sic] for headache S Stewart LPN 0235." Am. Compl., ECF No. 61, ¶ 41.

Tilson saw medical staff two days later, on April 30, 2018, when he met with defendant Humphrey, another LPN, to fill out his Health History and Assessment form. Id., ¶ 42; see also Humphrey Decl., ECF No. 117-4, ¶¶ 2–3; Tilson Dep., ECF No. 117-1, 89:20–23. Tilson says he told Humphrey he was "prescribed six 1-milligram Xanax a day and that [he] had tapered [himself] down to roughly three a day" before coming to the MRRJ, "so [he] wasn't feeling good." Tilson Dep., ECF No. 117-1, at 89:20–23; see also Humphrey Decl., ECF No. 117-4, ¶ 3. Tilson does not recall telling Humphrey about any other symptoms. Tilson Dep., ECF No. 117-1, at 90:6–9; Humphrey Decl., ECF No. 117-4, ¶ 4.

According to Humphrey, Tilson told her that he was prescribed Xanax but tapered off the medication prior to coming to MRRJ. Humphrey Decl., ECF No. 117-4, ¶ 3. He reported that he had no history of seizures and did not use drugs in the past or presently. Humphrey Decl., ECF No. 117-4, ¶ 4; see also Health History and Assessment (Humphrey Decl. Ex. 1), ECF No. 117-4, 3–4. His vital signs were normal and Humphrey did not observe any other symptoms of withdrawal. Id., ¶ 5.

At the time of Tilson's incarceration, MRRJ had a Benzodiazepine Taper Protocol and Medical Guidelines for Acute Benzodiazepine Withdrawal. Am. Compl., ECF No. 61, ¶

44; see also Taper Protocol, ECF No. 133-4. Tilson alleges that, for Humphrey and Stewart, these documents established medical procedures that were mandatory and "required no appreciable medical discretion." Am. Compl., ECF No. 61, ¶ 45. The procedures include: (1) performing a withdrawal assessment using a particular form; (2) taking vital signs; (3) obtaining a urine screen to check for benzodiazepine use, (4) contacting an outside primary care doctor and requesting related medical records; (5) requesting an appointment with the jail doctor or medical director; (6) requesting an appointment with the jail physician assistant; (7) requesting specialized housing to ensure patient safety; and (8) a review of policy to ensure quality of care. Id.; see also Taper Protocol, ECF No. 133-4, at 1–3.  Humphrey took Tilson's vital signs, which appeared normal, when filling out his "Health History and Assessment" form, but took none of the other steps. Am. Compl., ECF No. 61, ¶¶ 46–47.

On May 2, 2018, Officer Gary Taylor wrote in an incident report that Tilson approached him and told him he needed to be moved off the prison pod. Incident Report, ECF No. 117-6, at 1. Taylor also reported that Tilson was making "strange remarks that didn't make any sense." Id. In response, Taylor moved Tilson to segregation and recorded that he needed to see a mental health professional. Id. MRRJ's Standards of Procedure required that an inmate entering segregation receive an evaluation of his physical condition from the medical staff. Am. Compl, ECF No. 61, ¶ 59. These procedures also require "[t]he on duty Shift Supervisor" to "ensure the medical screen is performed in a timely manner." Id., ¶ 60. No medical evaluation was performed when Tilson entered segregation. Id., ¶ 67.

Defendant Officer Smals was on duty the night that Tilson moved to segregation. When Smals came on duty, he was told that Tilson was there to see Valley Mental Health

("VMH") the next day. See Smals Decl., ECF No. 115-1, at 6. Inmates in segregation are checked every 30 minutes unless they are placed on 15-minute checks. See Smals Dep., ECF No. 115-3, at 31:7–32:17, 43:17–44:2. Tilson had not been placed on 15-minute checks. Id., at 80:7–9. Jail policy requires that jail staff "personally observe inmates at least twice an hour" and that "[i]nmates who are violent or mentally ill or who demonstrate unusual or bizarre behavior will receive more frequent observation." Am. Compl., ECF No. 61, ¶ 96. The times that Smals stopped by Tilson's cell were recorded through an electronic round tracker called Guard 1 Plus. Smals Decl., ECF No. 115-1, at 4. To record a check on a particular cell, Smals would insert his individually programmed "pipe" into a read button located on the outside of Tilson's cell each time he performed a round. Id.; see also Smals Dep., ECF No. 115-2, at 34:10–35:1. This data is electronically logged and can be used to generate a report showing the times an officer checked on a particular cell. Id. A report generated for Tilson's cell on May 3, 2018, shows that Smals checked in outside of Tilson's cell at 3:02 a.m., 3:35 a.m., 4:07 a.m., 4:27 a.m., and then 5:09 a.m., when he noticed Tilson was seizing. See Jail Check Log, ECF No. 115-3, at 3. The electronic log indicates the hour and minute the "pipe" was inserted into the read button, but not the second.

A video camera was attached to one of the top corners of Tilson's cell. The recording from that camera provided to the court starts at 3:27 a.m. See Cell Video, ECF No. 115-7. At approximately 3:27 a.m., Tilson began seizing on and off in his cell. See id. at 3:27:00–3:28:50. At 3:35 a.m., during the time that Smals checked in outside of Tilson's cell, Tilson appeared to be sleeping on his side, switched sides, reached down his legs for a moment, and then sat up straight and leaned over his knees with his hands in his lap. See id. at 3:35:00–

3:35:59. When asked about this minute in deposition, Smals and plaintiff's counsel seem to agree that nothing is happening during this portion of the video which would cause concern. See Smals Dep., ECF No. 115-2, at 100:21–101:03.

About 30 seconds later, Tilson leaned over until he eventually fell over and hit his head on the floor. See id. at 3:36:31–3:36:50. Smals did not check on Tilson again until 4:07 a.m. Jail Check Log, ECF No. 115-3, at 3. From 4:05:50–4:09:15, Tilson appeared to move over onto his left side to sleep, alternate between bending one or both knees, and move his feet often, but did nothing that objectively appeared to be a medical emergency. See Cell Video, ECF No. 115-7, at 4:05:50–4:09:15. During his deposition, Smals said that "when [he] walked by there, [Tilson] was probably moving his legs," but that "did not look like a seizure to [him]," because he was "bending his knees." Smals Dep., ECF No. 115-2, at 101:24–102:2. Smals admits that Tilson "could have been" having a medical issue "at some point during that minute, but not when I looked." Id. at 102:9–11.

Smals checked on Tilson again at 4:27 a.m. Jail Check Log, ECF No. 115-3, at 3. During that time, Tilson was lying on the floor, on his back, mostly still, with his left arm extended, and his right hand on his chest. Cell Video, ECF No. 115-7, at 4:26:14–4:30:31. When asked about what he saw at 4:27 a.m., Smals said that Tilson was "laying like, I mean, every other inmate lays" and there was "nothing not normal about that when you look in the window." Smals Dep., ECF No. 115-3, at 103:8–11. When asked whether it was normal for an inmate to be lying on the floor, Smals replied that it was because inmates have more room on the floor than in their bunks. Id. at 103:13–104:9.

At approximately 5:09 a.m., Smals noticed that Tilson appeared to be seizing: his toes were pointed, his legs were stiff, and his left leg was moving. See Smals Dep., ECF No. 115-2, at 104:13–105:15. Smals called for medical assistance, and Registered Nurse ("RN") Sonya Randall Edwards and Officer Cody Carter came to Tilson's cell. Id., Am. Compl., ECF No. 61, ¶ 79. Randall concluded Tilson would need to go to the hospital. Id. Smals states in his declaration that, prior to this check-in, he "did not observe any behavior or indications that Mr. Tilson was suffering from a serious medical issue." Smals Decl., ECF No. 115-1, ¶ 9.

Tilson was driven to Augusta Health Center and then taken by helivac to Roanoke Memorial Hospital. Am. Compl., ECF No. 61, ¶ 85-86. According to Roanoke Memorial physicians, Tilson suffered a seizure of at least 45 minutes. Id., ¶ 87. As a result, he experienced a variety of serious medical conditions, requiring a variety of invasive medical procedures, all of which caused him pain and trauma. Id., ¶¶ 88–91. Tilson was put into a medically induced coma at Roanoke Memorial. Id., ¶ 90. When he woke up, he had multiple chipped teeth and could not walk on his own for three days. Id., ¶ 93. He was not permitted to drive for six months, not permitted to swim without another person present, and is currently subject to other health-based restrictions. Id., ¶ 94. Tilson also experienced significant memory loss that required him to relearn how to do his job, as well as the location of places he has visited many times before. Id., ¶ 95.

Tilson originally brought seven counts based on these events and six remain after various defendants have been dismissed: Count One, medical malpractice (ordinary negligence) against Humphrey and Stewart; Count Two, medical malpractice (gross negligence) brought against the same; Count Three, medical malpractice (willful and wanton

negligence) brought against the same; Count Four, deliberate indifference in violation of Tilson's Eighth Amendment rights, pursuant to 42 U.S.C. § 1983, brought against the same; Count Five, ordinary negligence brought against Smals; and Count Seven, deliberate indifference in violation of Tilson's Eighth Amendment rights, pursuant to 42 U.S.C. § 1983, brought against Smals. Id., ¶¶ 115–157.

## II.   SUMMARY JUDGMENT MOTIONS

### A.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

### B.   Deliberate Indifference

The right at stake in this case arises under the Eighth Amendment and its protections against cruel and unusual punishment. A plaintiff must show that a defendant acted with deliberate indifference to a serious medical need to state a claim under the Eighth Amendment for the unconstitutional denial of medical assistance. West v. Atkins, 487 U.S. 42, 48 (1988); Estelle v. Gamble, 429 U.S. 97, 104 (1976); Conner v. Donnelly, 42 F.3d 220, 222 (4th Cir. 1994).

A serious medical need is a condition that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). "Several courts have found that symptoms of alcohol and drug withdrawal qualify as a serious medical need." Thornhill v. Aylor, 3:15-CV-00024, 2016 WL 8737358, at *9 (W.D. Va. Feb. 19, 2016) (citing Boren v. Nw. Reg'l Jail Auth., No. 5:13cv013, 2013 WL 5429421, at *9 (W.D. Va. Sept. 30, 2013) (alcohol withdrawal); Mayo v. City of Albany, 357 F. App'x 339, 341-42 (2d Cir. 2009) (heroin and alcohol withdrawal); Sylvester v. City of Newark, 120 F. App'x 419, 423 (3d Cir. 2005) (drug withdrawal); Foelker v. Outagamie Cnty., 394 F.3d 510, 513 (7th Cir. 2005) (methadone withdrawal)). See also French v. Daviess Cnty. Ky., 376 F. App'x 519, 522 (6th Cir. 2010) (assuming plaintiff "had a serious medical condition arising out of his apparently strong addiction to Xanax") and Idyle v. N.C. Dept. of Correction Medical Dept., No. 5:12-CT-3190-FL, 2014 WL 414285 (E.D.N.C. Feb. 4, 2014) (assuming plaintiff had a serious medical condition when his methadone prescription was abruptly terminated causing withdrawal).

In addition, this court has previously found that untreated seizures are a serious medical need sufficient to state a deliberate indifference claim. See Boren v. N.W. Regl. Jail Auth., 5:13CV013, 2013 WL 5429421, at *10 (W.D. Va. Sept. 30, 2013). Nevertheless, "[i]n order to establish a claim of deliberate indifference to medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. Farmer v. Brennan, 511 U.S. 825, 838 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 837; see Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851–52. A health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness. Id. at 851. In other words, "[d]eliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson, 195 F.3d at 695 (citing Estelle, 429 U.S. at 105–06).

**1.   Stewart's Motion for Summary Judgment**

According to Tilson, the day after he turned himself into the MRRJ he began to experience symptoms of withdrawal, including a headache. He told Stewart that he had a headache and that he was withdrawing from Xanax. Tilson Dep., ECF No. 117-1, at 51:9– 52:4; Stewart Decl., ECF No. 117-3, ¶¶ 2–3. According to Stewart, Tilson was not yet exhibiting any signs of withdrawal. Stewart Decl., ECF No. 117-3, ¶ 4. He communicated appropriately, did not appear anxious or agitated, was not sweating excessively, was not hallucinating, did not appear to shake or have a tremor, and did not complain of any present symptom other than his headache. Id.

Stewart treated Tilson's headache by giving him Ibuprofen. Id., ¶ 3. For the possibility of seizures, she tried to ensure that Tilson had a cell with a window, she told Tilson to put his sleeping mat on the floor, and she informed the booking officer of Tilson's reported seizure history and told him to let Medical know if there were any issues. Id. However, Stewart did not start Tilson on a taper protocol because she "did not believe Tilson's migraine, on its own, was indicative of any withdrawal" without any other symptoms. Stewart Decl., ECF No. 117-3, ¶¶ 4–5; see also Stewart Dep., ECF No. 117-2, at 23:14–20 (explaining that she did not start Tilson on the taper protocol "[b]ecause according to [her] training and what [she] observed, he was not withdrawing.")

Stewart argues that Tilson's only symptom was a headache, which does not amount to an objectively serious medical need, citing in support Mahon v. Kilgore, No. 7:17-cv-00406, 2018 WL 4655756, at *10 (W.D. Va. Sept. 27, 2018). Stewart is correct that the court in Mahon stated that "routine headaches" do not constitute a serious medical need. But in this case, while Tilson presented with a headache, he also told Stewart that he was

12

withdrawing from Xanax and that he had a history of seizures. Stewart Dep., ECF No. 117-2 at 15:4-16:7. Stewart testified that she did not start the taper protocol because, based on her training and what she observed, Tilson was not withdrawing. Id., ECF No. 117-2 at 23:14–20. However, she also testified that a headache can be a sign or symptom of Xanax withdrawal. Id., ECF No.117-2 at 25:6–11. Construing the facts in the light most favorable to Tilson, his complaints of headache coupled with his statement that he was withdrawing from Xanax and that he had a history of seizures meets the first prong of the Eighth Amendment test of having an objectively serious medical need.

To meet the second prong of the test, Tilson must show that Stewart personally was aware of facts indicating a substantial risk of serious harm and that she actually recognized the risk. Farmer, 511 U.S. at 838. Tilson must further show that Stewart acted with actual intent to disregard the risk or that she recklessly disregarded the risk. Miltier, 896 F.2d at 851.

Stewart cites to the testimony of Nurse Regina Chestnut with the MRRJ who testified that nurses at MRRJ are trained to only start the taper protocol if an individual has signs or symptoms of withdrawal. Decl. of Nurse Chestnut, ECF. No. 117-11 at 147:22–23. Nurse Chestnut stated that inmates must have "multiple signs and symptoms, not just one complaint of something, and also the nurse is going to her judgment on that, as well." Id., ECF No. 117-11 at 143:3–6. She said symptoms could include things like abnormal vital signs, dilated pupils, chills, and agitation. Id., ECF No. 117-11 at 143:9–14. Nurse Chestnut testified that an inmate will not be treated for acute benzodiazepine withdrawal unless he is displaying signs or symptoms of withdrawal. Id., ECF No. 117-11 at 148:15–25. She further

stated that the taper protocol is only begun after there are signs or symptoms of withdrawal. Id., ECF No. 117-11 at 149:18–150:5.

However, Nurse Chestnut's testimony conflicts with the language of the Benzodiazepine Taper Protocol. The taper protocol first provides that patients staying less than two to four weeks could either continue their medication or taper off. Taper Protocol, ECF No. 133-4 at 1. Tilson was sentenced to two months at MRRJ so he did not have the choice of remaining on the medication. Patients using "street meds" or those who did not have a current labeled bottle of Xanax[2] "must have a Point of Care urine drug screen to confirm [Xanax] in their system." Id. If the urine screen did not show the presence of Xanax, the person was to be placed "in observation for signs/symptoms of withdrawal if there is a history of recent sudden stoppage of meds; notify the doctor." Id. (emphasis in original).

The taper protocol sets out the taper schedule based on the amount of Xanax a person was taking when they were admitted to the facility. For a person like Tilson who was taking 3 mg of Xanax per day, the protocol provides for a four-week taper, substituting Librium for Xanax at a decreasing dose over the four-week period. Id., at 2. The protocol includes the notation that, "All inmates taking narcotics including [Xanax] will be housed in the infirmary. Notify the doctor. Have the doctor see them on their next visit." Id., at 2.

The differences between Nurse Chestnut's testimony and the tapering protocol highlight fact issues that preclude summary judgment in this case. The tapering protocol requires that an inmate who claims to be using Xanax be tested for presence of the

---

[2] Because Tilson was using Xanax, the court will refer to Xanax rather than the broader category of benzodiazepines discussed in the Taper Protocol.

14

medication in his urine and placed on the protocol if positive. If testing is negative but there is a recent sudden stoppage of medication, the person is supposed to be placed in observation and the doctor notified. Stewart appears to have understood that Tilson was at risk for withdrawal seizures because she took precautions such as advising him to sleep on the floor, giving him a cell with a window, and telling other jail personnel that he had a history of seizures. Nevertheless, she took none of the steps outlined in the taper protocol. A jury could find that her failure to do so was reckless or grossly inadequate.[3]

To be clear, the simple fact that Stewart did not follow the protocol does not create a fact issue here. It is well established that "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation." Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013). Rather, given that it is undisputed that Tilson told Stewart that he was abruptly stopping Xanax and also that he had a headache and history of seizures, and that she appeared to understand the risk presented, a jury could find that her disregard of the protocol amounted to deliberate indifference of Tilson's serious medical needs. See Skaggs v. Jones, No. 3:09CV346, 2012 WL 5207556 at *5 (N.D. Ind. Oct. 17, 2021) (denying summary judgment because "a reasonable jury could conclude that a doctor's decision to not wean plaintiff off of Xanax or to prescribe some other medication to reduce the risk of seizure amounted to deliberate indifference"); compare Skaggs with Chatham v. Adcock, 334 F. App'x 281, 289 (11th Cir. 2009) (granting summary judgment when there was no evidence that defendants

---

[3] Indeed, the point of the tapering protocol appears to be the prevention of serious symptoms of withdrawal, such as those experienced by Tilson. To require inmates to have objective signs, such as those described by Nurse Chestnut, before implementation of the taper protocol would render it pointless and ineffective.

who stopped inmate's Xanax were aware that inmate had a serious medical need for Xanax) and Dupuis v. Magnusson, No. 04-10-B-H, 2008 WL 703967 (D. Me. Mar. 7, 2008) (granting summary judgment to doctor who tapered inmate off Xanax and substituted other medications, believing the other medications were helpful in controlling the inmate's anxiety and depression).

Tilson's abrupt stoppage of Xanax had dire consequences for him. The conflicts in the evidence regarding whether Stewart knew about the risks of stopping Xanax and whether she recklessly disregarded the risks are best decided by a jury. For this reason, Stewart's motion for summary judgment is **DENIED**.

### 2.  Humphrey's Motion for Summary Judgment

Fact issues also preclude the granting of summary judgment to defendant Humphrey. Humphrey saw Tilson three days after he arrived at the jail for an intake exam. Humphrey Decl., ECF No. 117-4, ¶ 2. Tilson says he told Humphrey he was "prescribed six 1-milligram Xanax a day and that [he] had tapered [himself] down to roughly three a day" before coming to the MRRJ, "so [he] wasn't feeling good." Tilson Dep., ECF No. 117-1, at 89:20–23; see also Humphrey Decl., ECF No. 117-4, ¶ 3. Tilson does not recall telling Humphrey about any other symptoms. Tilson Dep., ECF No. 117-1, at 90:6–9; Humphrey Decl., ECF No. 117-4, ¶ 4.

Humphrey recalls the visit differently. She states that during the exam, Tilson told her that he had been taking Xanax but had tapered off it before turning himself in at MRRJ. Humphrey Decl., ECF No. 117-4, ¶ 3. She stated at her deposition that Tilson did not report a sudden stop in his medication. Humphrey Dep., ECF No. 117-5 at 40:23–25. Rather, he

16

told her that "he was not currently taking Xanax, that he had completed his taper." Id., ECF No. 117-5 at 41:15–18. However, under a section of the health assessment form asking the provider to list Tilson's current medications, Humphrey wrote "Xanax." Health History and Assessment form, Humphrey Decl., ECF No. 117-4, at 3.

According to Humphrey, Tilson reported that he had no history of seizures and did not use drugs in the past or presently. Humphrey Decl., ECF No. 117-4, ¶ 4; see also Health History and Assessment (Humphrey Decl. Ex. 1), ECF No. 117-4, at 3–4. His vital signs were normal. Id., ¶ 5. Tilson "communicated appropriate[ly], did not appear confused, was not responsive to internal stimuli, and made no complaints of nausea, vomiting, or diarrhea." Id. He "was not sweating or shaking," "did not appear anxious or agitated," and "did not report feeling sick in any manner." Id. "From [Humphrey's] training and experience, Tilson showed no signs or symptoms of withdrawal." Id. Humphrey acknowledged that the taper protocol states that if a drug screen shows that an inmate has Xanax in his system, medical staff are supposed to taper the inmate off the medications. Humphrey Dep., ECF No. 117-5 at 40:14–17.

Although Tilson did not appear to have symptoms of withdrawal at the time he talked to Humphrey, he asserts that the told her he had only been able to taper to 3 mg of Xanax per day. Given the explicit instructions of the MRRJ taper protocol for inmates using Xanax when they enter MRRJ, if a jury believes Tilson's testimony, it could find that defendant Humphrey recklessly disregarded the dangers of Xanax withdrawal by failing to adhere to the taper protocol. Accordingly, Humphrey's motion for summary judgment is **DENIED**.

### 3. Qualified Immunity

Defendants Humphrey and Stewart argue that they are entitled to qualified immunity.

> The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate clearly established constitutional or other rights that a reasonable officer would have known." Sims v. Labowitz, 885 F.3d 254, 260 (4th Cir. 2018). The doctrine is intended to "balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, 571 U.S. 3, 5, 134 S.Ct. 3, 187 L.Ed.2d 341 (2013) (internal quotation marks and citation omitted).

Hupp v. Cook, 931 F.3d 307, 317 (4th Cir. 2019). In addressing an argument that a defendant is entitled to qualified immunity, the court first must determine whether a plaintiff has asserted violation of a constitutional right. Id. As discussed above, the court finds that viewing the facts in the light most favorable to Tilson, he has established that Stewart and Humphrey violated his right to medical care under the Eighth Amendment by recklessly disregarding the need to place him on the taper protocol after he told them had he had abruptly stopped taking Xanax.

The court must next determine whether the right was clearly established such that a reasonable officer would have known the conduct was unconstitutional. Id. Whether a right is clearly established is a question of law for the court to decide. Id. at 18. However, a plaintiff is not required to show that there is a case directly on point in order for a court to conclude that the law was clearly established so long as "'existing precedent [has] placed the

statutory or constitutional question beyond debate.'" Ashcroft v. al–Kidd, 563 U.S. 731, 741 (2011); Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015).

Stewart and Humphrey argue that no reasonable nurse in their position would have known they were being deliberately indifferent. However, at least one court in the Fourth Circuit denied summary judgment to nurses who took no action when a pre-trial detainee told them that he was a heroin addict and would likely undergo the symptoms and complications of heroin withdrawal while in jail. Gonzalez v. Cecil Cnty. Md., 221 F.Supp.2d 611, 613 (D. Md. 2002). Over the course of several days the man became increasingly ill and died. The nurses argued that they were acting in accordance with the established protocol, but the court declined to find they were entitled to qualified immunity. Id. at 617. The court commented that the nurses had pointed to no authority for the proposition that an individual is entitled to qualified immunity when they are "just following orders." Id. See also Hanlin-Cooney v. Frederick County, Md. No. WDQ-13-1731, 2014 WL 576373 (D. Md. Feb. 11, 2014) (finding representative of inmate who committed suicide while going through withdrawal stated a claim against a medical care provider who knew he was going through withdrawal but provided no medical treatment or surveillance); Idyle, 2014 WL 414285 at *3 (finding that while cessation of methadone is not itself a constitutional violation, the subsequent failure to monitor and treat withdrawal symptoms could rise to the level of a constitutional violation).

The court finds that it is well established that the right to be monitored and treated for withdrawal from addictive drugs falls under the protections of the Eighth Amendment.

Accordingly, the court further finds that Stewart and Humphrey are not entitled to qualified immunity on Tilson's claims.

### 4. Smals' Motion for Summary Judgment

Tilson has not offered evidence upon which a reasonable jury could find that Smals knew of and disregarded any obvious risk to Tilson's health and safety. Tilson alleges that Smals was aware that he was suffering seizures or needed more frequent monitoring prior to 5:09 a.m. when he called for medical emergency assistance. However, there is no evidence that Smals was provided any information about Tilson's condition beyond the fact that he was placed in segregation to be evaluated by VMH the next day. Smals' superiors did not tell him to do anything more than check on Tilson every 30 minutes, and the evidence shows that he did so until he noticed Tilson seizing at 5:09 a.m.

The video evidence, when viewed at the times Smals checked on Tilson's cell, does not show that Smals would have observed any obvious behavior indicating Tilson was seizing or suffering from some other serious medical condition. While there was some movement during those times, none show Tilson seizing to such an extent that failure to act could be considered deliberately indifferent. To the extent Tilson argues that Smals should have checked on him every 15 minutes, there is no evidence that Smals subjectively recognized the risks of not checking on Tilson every 15 minutes and checked on him less frequently anyway. To the contrary, Smals' supervisors made the decision to not put Tilson on 15-minute checks and there is no evidence that Smals saw anything to alert him to call his watch commander and increase the frequency of checks on Tilson.

Tilson also disputes that Smals actually looked in his cell either at all or for a sufficient amount of time to notice that he was seizing. Tilson argues that "[h]ad Smals been actually looking at Tilson during his pipe-swipe times of 4:07 and 4:27, he would have seen Tilson shaking, moving, extending his arms and legs visibly lifted and rigid, as clearly—or even more clearly—suffering a medical emergency than at 5:09 a.m., when Defendant Smals reported Mr. Tilson's condition to medical." Mem. in Opp'n, ECF No. 132, at 13.

These are arguments that Smals should have seen Tilson's seizure earlier, but none support the proposition that Smals was deliberately indifferent to Tilson's serious medical needs. There is no evidence that Smals actually recognized the existence of such a risk. Farmer, 511 U.S. at 838. Tilson argues that there could have been evidence that Smals did not even look into Tilson's cell when he walked by, but the video that would show that was overwritten. However, this speculation does not create a genuine factual dispute as to whether Smals was actually aware of Tilson's serious medical need. Smals may have been negligent in failing to notice Tilson seizing earlier, but no reasonable juror could find that he "subjectively recognized that his actions were 'inappropriate in light of that risk.'" Parrish, 372 F.3d at 303.

### D.      Tilson's State Law Claims

#### 1.      Gross Negligence and Willful and Wanton Negligence

Tilson's gross negligence and willful and wanton negligence claims against Stewart and Humphrey also survive summary judgment for the same reasons Tilson has shown that fact issues preclude summary judgment on his deliberate indifference claim under the Eighth Amendment. "Gross negligence is 'a degree of negligence showing indifference to another

and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.'" <u>Elliott v. Carter</u>, 292 Va. 618, 622, 791 S.E.2d 730, 732 (2016) (citing <u>Cowan v. Hospice Support Care, Inc.</u>, 268 Va. 482, 487, 603 S.E.2d 916, 919 (2004)). Because 'the standard for gross negligence [in Virginia] is one of indifference, not inadequacy,' a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." <u>Elliott</u>, 292 Va. at 622, 791 S.E.2d at 732 (citing <u>Kuykendall v. Young Life</u>, 261 Fed.Appx. 480, 491 (4th Cir. 2008)). Willful and wanton negligence is "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." <u>Cowan</u>, 268 Va. at 487, 603 S.E.2d at 919.

Construing the facts in Tilson's favor, a jury could find that Stewart and Humphrey "complete[ly] neglect[ed]" the serious risk posed by Xanax withdrawal. Stewart apparently believed that Tilson might have a seizure, because she tried to ensure that Tilson had a cell with a window, told him to put his sleeping mat on the floor, and informed the booking officer of Tilson's reported seizure history. However, she did not take any of the steps in the taper protocol designed to prevent him from suffering symptoms of withdrawal.

Humphrey took Tilson's vital signs and examined him for signs of withdrawal but found none at the time. However, Tilson told her that he had abruptly stopped Xanax and did not feel well. A jury could find that by deciding not to follow the taper protocol, Humphrey acted with reckless indifference to the consequences and knowing that Tilson probably would be harmed. <u>Cowan</u>, 268 Va. at 487, 603 S.E.2d at 919. As such, Stewart and

22

Humphrey are not entitled to summary judgment on Counts II (gross negligence) and III (willful and wanton negligence).[4]

## 2.   Ordinary Negligence and Sovereign Immunity

Smals, Humphrey, and Stewart argue that they are immune from Tilson's state law claims as local government employees. "Under longstanding principles, sovereign immunity protects municipalities from tort liability arising from governmental functions, but not proprietary functions." Massenburg v. City of Petersburg, 298 Va. 212, 218, 836 S.E.2d 391, 395 (2019). As this court has previously explained, sovereign immunity can, but does not always, protect employees of local governments. James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980); see also Messina v. Burden, 228 Va. 301, 312, 321 S.E.2d 657, 663 (1984). While Virginia, its political subdivisions, and high-level governmental officials have absolute immunity unless waived, "other government employees and officials have qualified immunity depending on the function they perform and the manner of performance." Cunningham v. Rossman, 80 Va. Cir. 543, *4 (2010). Under the four-part test in James, the court must consider: (1) the nature of the function performed by the employee; (2) the extent of the state's interest and involvement in that function; (3) the degree of control exercised by the state over the employee; and (4) whether the alleged negligent act involved judgment and discretion." 221 Va. at 53, 282 S.E.2d at 869.

As this court previously held, the first three factors are satisfied in this case. The operation of a regional jail is a per se governmental function. See Va. Code §§ 53.1–85.7, 53.1–32; 53.1–26; 53.1–133.01. This is so because the state is sufficiently interested in,

---

[4] Tilson has not brought claims for gross negligence or willful and wanton negligence against Smals.

involved in, and exercises sufficient control over the supervision of medical care provided to inmates in its regional jails. See Coppage v. Mann, 906 F. Supp. 1025, 1048 (E.D. Va. 1995); Lohr v. Larsen, 246 Va. 81, 86, 431 S.E.2d 642, 645 (1993). Whether Smals, Humphrey, and Stewart are shielded from Tilson's negligence claims turns on whether their actions involved judgment and discretion.

The Supreme Court of Virginia has repeatedly found judgment and discretion is necessary to assess a person's medical or physical condition. For example, in Whitley v. Commonwealth, 260 Va. 482, 493–94, 538 S.E.2d 296, 302 (2000), the Supreme Court of Virginia found that the defendant nurses exercised judgment and discretion where it was alleged that they allowed plaintiff's medication levels to fall below the "required therapeutic minimums," and "misconstrued and misapplied" physicians' orders. The court reasoned that "[a]lthough the nurses' acts described in this record have some ministerial components, the acts themselves are discretionary in nature and require the exercise of judgment when considered in the context of the treatment rendered." Id. at 494, 538 S.E.2d at 302. More recently, in Pike v. Hagaman, 292 Va. 209, 787 S.E.2d 89 (2016), the Supreme Court of Virginia held that a nurse who was ordered by a physician to position the plaintiff's head to avoid pressure near a neck incision was not performing a ministerial act for two reasons:

> First, the evidence establishes that Hagaman had to exercise her discretion to determine how to carry out the doctor's orders to avoid pressure in the vicinity of Pike's neck incision and to keep his head in a neutral position. Second, the specific omissions alleged, i.e., Hagaman's failure to monitor the position of Pike's head and failure to avoid pressure near the incision, cannot be viewed in artificial isolation. In other words, the exercise of judgment and discretion is unavoidably contextual. Hagaman's sphere of responsibility extended beyond simply positioning the patient and avoiding pressure near the neck incision. She had to prioritize and address many tasks. According to the evidence, she was required to provide "minute to minute" care by, among

> other things, monitoring a patient's drugs, checking his vital signs, and consulting with residents. Hagaman was exercising discretion in caring for Pike. Therefore, this factor, while not determinative, supports a finding of sovereign immunity.

Id. at 217–18; 787 S.E.2d at 93 (internal citation omitted).

The Supreme Court of Virginia has held, in some situations, that a plaintiff cannot transform a discretionary function to a ministerial act and avoid the sovereign immunity bar by relying on internal policies. In Colby v. Boyden, 241 Va. 125, 129, 400 S.E.2d 184, 187 (1991), the court held that the city guidelines governing responses to emergency situations "do not, and cannot, eliminate the requirement that a police officer, engaged in the delicate, dangerous, and potentially deadly job of vehicular pursuit, must make prompt, original, and crucial decisions in a highly stressful situation." Id. at 129, 400 S.E.2d at 187. Applying Colby, the court similarly held in Nat'l R. Passenger Corp. v. Catlett Volunteer Fire Co., 241 Va. 402, 413, 404 S.E.2d 216, 222 (1991), that a firefighter who crossed railroad tracks without stopping still exercised judgment and discretion and was entitled to sovereign immunity. As this court noted in its prior memorandum opinion, "the existence of regulations and guidelines does not answer the question of whether, and to what extent, the employee in question must exercise discretion and judgment in applying those rules and procedures in often uncertain and confused situations." Mem. Op., ECF No. 65, at 16 (quoting Dowdy v. Pamunkey Reg'l Jail Auth., No. 3:14-cv-003-JAG, 2014 WL 2002227, at *4 (E.D. Va. May 15, 2014)).

Tilson alleges that, after telling them about his Xanax withdrawal, Stewart and Humphrey failed to perform the actions required by MRRJ's Benzodiazepine Taper Protocol and Medical Guidelines for Acute Benzodiazepine. Am. Compl., ECF No. 61, at ¶ 116. But,

in choosing how to treat Tilson, Stewart and Humphrey were using their own judgment and discretion. While MRRJ has a taper protocol, it was within Stewart's and Humphrey's medical judgment to decide if Tilson needed to begin the taper protocol and when the Medical Guidelines for Acute Benzodiazepine Withdrawal applied. According to their statements, Stewart and Humphrey did not believe Tilson needed to be put on the taper protocol because they determined, through their observations of Tilson, that he was not withdrawing from Xanax. They exercised judgment and discretion to determine that Tilson was not showing any objective signs that his complaints of Xanax withdrawal required intervention at that time. Because this process required judgment and discretion, Stewart and Humphrey are entitled to sovereign immunity.

Tilson also alleges that Smals failed to observe him as frequently as required while he was in segregation. Am. Compl, ECF No. 61, ¶ 147. Here, too, the court finds that Smals' decision not to elevate the level of Tilson's supervision based on his assessment of Tilson's medical condition required the exercise of judgment and discretion. That decision would have required Smals to recognize that Tilson was suffering from a serious medical condition that was not reported to him. Smals is not a medical provider, he was not told why Tilson was placed in segregation during the shift prior to his, and he did not have access to Tilson's medical or mental health records. The video evidence shows that, at the times and intervals that Smals did his rounds, it was not obvious that Tilson was having a medical emergency or was acting unusually prior to when Smals called for emergency medical services at 5:09 a.m.

"In short, the [MRRJ policies] required [Stewart, Humphrey, and Smals] to exercise judgment and discretion in receiving, classifying, and placing incoming inmates." <u>Dowdy</u>,

2014 WL 2002227, at *4. All four <u>James</u> test factors weigh in favor of sovereign immunity, and Tilson's claims for ordinary negligence must be dismissed.

## IV.   CONCLUSION

For these reasons, the court **DENIES** defendants Stewart and Humphrey's motion for summary judgment, ECF No. 116 and **GRANTS** defendant Smals' motion for summary judgment, ECF No. 114.

An appropriate order will be entered.

Entered: September 24, 2021

Michael F. Urbanski
Chief United States District Judge